**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190450-U

Order filed January 10, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* D.R., Jr., a Minor | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| (The People of the State of Illinois, | ) | Peoria County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-19-0450 |
| | ) | Circuit No. 17-JA-154 |
| v. | ) | |
| | ) | The Honorable |
| Krishna W., | ) | David A. Brown |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justice McDade concurred in the judgment.
Justice Schmidt dissented.

_____

**ORDER**

¶ 1      *Held*:   Trial court's order finding mother unfit for failure to make reasonable progress toward the return of her child in a nine-month period was against the manifest weight of the evidence where mother completed all but one court-ordered task and was making progress on the incomplete task during the nine-month period.

¶ 2      In June 2017, the State filed a petition, alleging that D.R. Jr. was neglected in that his environment was injurious to his welfare based on numerous incidents of domestic violence between D.R.'s father, D.R. Sr., and respondent, D.R.'s mother. Following a hearing, the trial court

found D.R. Jr. neglected. In April 2018, the State filed a petition to terminate respondent's rights. In September 2018, the State filed a supplemental petition, alleging that respondent was unfit because she failed to make reasonable progress toward the return of D.R. Jr. during the nine-month period of November 9, 2017, to August 9, 2018. Following adjudication and best interest hearings, the trial court found respondent unfit and terminated her parental rights. Respondent appeals the trial court's orders finding her unfit and terminating her parental rights. We reverse.

¶ 3                                                    BACKGROUND

¶ 4        On June 8, 2017, the State filed a petition alleging that D.R. Jr. was a neglected minor in that his environment was injurious to his welfare because "[t]here has been a history of domestic violence between the mother and the minor's father *** and the mother has a history of failing to protect the minor from [the father] as evidenced by" the following: (1) the father firing shots into a vehicle D.R. Jr. and respondent were in on June 4, 2017, with one shot striking respondent; (2) the father pushing respondent on January 14, 2017; (3) the father punching respondent in the eye on December 23, 2012; (4) the father pulling respondent's hair on July 25, 2012; (5) the father punching respondent in the head on February 13, 2012; and (6) the father threatening to stomp on respondent's head on December 3, 2011. Respondent filed a response to the petition, denying almost every allegation.

¶ 5        On August 14, 2017, an adjudication hearing was held. Two Peoria police officers testified that they responded to a 911 call shortly before 3:00 a.m. on June 4, 2017. When they arrived on the scene, they found respondent in the driver's seat of a vehicle and D.R. Jr., who was seven years old, in the back seat. The vehicle contained several bullet holes. Respondent told the officers that D.R. Sr. shot at her three to four times. A bullet grazed respondent's neck, and she was taken by ambulance the hospital. D.R. Jr. was not injured.

2

¶ 6    Three other Peoria police officers testified that they responded to domestic disturbance calls from respondent. On January 14, 2017, respondent reported to an officer that D.R. Sr. pushed her. On December 23, 2012, an officer found respondent with "significant swelling developing to the eye." Respondent told the officer that D.R. Sr. struck her. On February 1, 2012, respondent told an officer that D.R. Sr. punched her in the back of the head. On each of those occasions, D.R. Sr. was gone by the time the officers arrived.

¶ 7    Respondent testified that she went to Walgreens at approximately 2:20 a.m. on June 4, 2017, to purchase a Visa card to pay her phone bill. She took D.R. Jr. with her. When she returned home but before she exited her vehicle, she saw D.R. Sr. driving toward her. She thought there was going to be an argument, so she called 911. While she was on the phone with the 911 dispatcher, she heard a "boom," which was a gunshot, and D.R. Sr. "took off." Respondent denied seeing D.R. Sr. with a gun. She said she told police that D.R. Sr. shot her because she was "afraid" and "angry," but she does not believe that it was D.R. Sr. who shot her. She is still in a relationship with D.R. Sr., who is in jail. She talks to him on the phone daily.

¶ 8    On September 11, 2017, the trial court entered an adjudication order finding D.R. Jr. neglected. The bases for the court's finding were: "petition; father shot mother in front of child; domestic violence."

¶ 9    On October 30, 2017, the trial court entered a dispositional order finding respondent unfit for failing to protect D.R. Jr. and being dishonest about the June 4, 2017 incident and other domestic violence incidents. The trial court made D.R. Jr. a ward of the court and appointed Illinois Department of Children and Family Services (DCFS) as guardian. Respondent was ordered to: (1) execute all authorizations for release of information requested by DCFS or designees; (2) cooperate fully with DCFS or its designee, (3) submit to a psychological examination arranged by

3

DCFS or designees and follow recommendations made; and (4) participate in and successfully complete counseling.

¶ 10    On April 18, 2018, the State filed a petition for termination of parental rights. Count I alleged that respondent failed to maintain a reasonable degree of interest, concern or responsibility as to D.R. Jr.'s welfare. On April 24, 2018, D.R. Sr. was convicted of attempted murder and possession of a weapon by a felon for the June 4, 2017 incident and was sentenced to concurrent prison terms of 40 years and 10 years respectively. He is scheduled to be released from prison in 2051.

¶ 11    On April 26, 2018, a permanency hearing report was prepared by D.R. Jr.'s caseworker, Jasmine Bradford. Bradford found that respondent had made "satisfactory progress" and put forth "reasonable efforts" toward having D.R. Jr. returned to her home. Specifically, respondent had (1) completed a psychological examination on January 18, 2018, (2) completed a domestic violence class on December 26, 2017, (3) obtained and maintained stable housing, (4) was regularly attending counseling and, according to her counselor, had made progress in counseling, and (5) visited regularly with D.R. Jr. According to Bradford, respondent "has a really good relationship with her son." She missed none of her 25 scheduled visits with him and "demonstrate[s] nurt[ur]ing behavior" during visits. Bradford concluded that respondent "has made progress on her services and needs to continue to address her domestic violence relationship in counseling to ensure [s]he can protect herself and her son."

¶ 12    In June 2018, Bradford received audio recordings of phone conversations between respondent and D.R. Sr. from April 2018 while D.R. Sr. was in Peoria County Jail. Bradford and her supervisor listened to the recordings and, based on the conversations therein, believed that respondent and D.R. Sr. were "in a relationship." When confronted about the phone calls,

4

respondent denied that she was in a relationship with D.R. Sr. Bradford concluded that respondent "has been dishonest throughout the life of the care regarding her relationship with [D.R. Sr.], which presents significant safety issues."

¶ 13 In June 2018, Kristy Hemmele, respondent's counselor, reported that respondent "has remained faithful in her attendance and participation during the counseling sessions." When Hemmele questioned respondent about her phone conversations with D.R. Sr., respondent replied, "There was no court order saying I could not talk to him, and so I did and we talked about many things." Respondent denied having any contact with D.R. Sr. in six weeks and said she was focusing on being a good parent.

¶ 14 On September 27, 2018, the State filed a supplemental petition for termination of rights. Count IV alleged that respondent was unfit in that she has failed to make reasonable progress toward the return of the minor from the nine-month period of November 9, 2017, to August 9, 2018.

¶ 15 In a permanency hearing report completed on November 15, 2018, Bradford reported that respondent had made satisfactory progress and reasonable efforts. However, she stated that respondent "needs to ensure that [D.R. Jr.] is placed back into an environment that is safe and free of any violence" and that respondent had failed to do so by continuing to communicate with D.R. Sr.

¶ 16 At a hearing on December 3, 2018, the court dismissed Count I of the termination petition. The trial court allowed the State to admit recordings of the telephone conversations between respondent and D.R. Sr. from April 2018, as well as Peoria County Jail records showing that respondent made deposits into D.R. Sr.'s commissary account.

¶ 17    Hemmele testified that from February 2018 to April 2018, it was her understanding that respondent and D.R. Sr. had "no relationship" "[b]ecause he was in jail." In May 2018, Bradford provided her with conversations between D.R. Sr. and respondent. Hemmele listened to the conversations, which contained "[v]ery explicit, graphic, sexual" communications. Hemmele did not know respondent was having conversations with D.R. Sr. or giving him money until then. Hemmele talked to respondent about her relationship with D.R. Sr. "[v]ery few" times. According to Hemmele, "He was in jail and it was pretty much a moot point from there."

¶ 18    Hemmele had "no doubt" that respondent was invested in cooperating with her in counseling. Between May and August 9, 2018, Hemmele focused on respondent's need to provide a safe environment for D.R. Jr. Hemmele believed that respondent made progress from May to August 2018, in understanding the need to provide a safe environment for D.R. Jr. Hemmele found respondent to be very focused on her son and doing what is best for him. As of August 9, 2018, Hemmele did not believe that respondent could ensure D.R. Jr.'s safety because respondent continued to deny that D.R. Sr. committed domestic violence against her. However, respondent continued to make progress in that area after August 9, 2018. Hemmele did not expect respondent to be able to ensure D.R. Jr.'s safety by August 9, 2018.

¶ 19    Tyrease Taylor, D.R. Jr.'s caseworker from June 2017 to February 2018, testified that respondent completed a domestic violence class in January 2018 and a parenting class prior to November 9, 2017. Bradford took over as D.R. Jr.'s caseworker in February 2018.

¶ 20    Sarah Beintema supervised visits between respondent and D.R. Jr. from January to August 9, 2018. During those visits, respondent and D.R. Jr. played, talked, and were "[e]xcited to see each other." According to Beintema, respondent's parenting of D.R. Jr. was "very appropriate." Respondent had activities planned and appropriately disciplined D.R. Jr. when necessary.

6

Respondent always asked D.R. Jr. about school and was nurturing toward him. The visits Beintema supervised were "all positive."

¶ 21    Respondent testified that she lived in the same home from November 9, 2017 to August 9, 2018. She maintained her home and worked as a hair stylist. She never missed any visits with her son or sessions with her counselor. She started weekly counseling in February 2018, and was still in counseling on August 9, 2018. She last talked to D.R. Sr. in May 2018. She said she did not have a problem cutting off contact with D.R. Sr. because "I decided I need to get my son back." During the relevant time period, respondent attended doctor visits with D.R. Jr., visited him at school, and took him on outings. She gave D.R. Jr. clothes, books, money and other gifts. She talked to D.R. Jr. daily on FaceTime. Respondent was not involved in any domestic violence incidents between November 9, 2017 and August 9, 2018. She provided $2,678 to D.R. Sr. while he was in the county jail. She said those funds came from D.R. Sr.'s business.

¶ 22    In its oral ruling on March 4, 2019, the trial court stated that "certainly during the relevant time period [respondent] was engaged and making efforts." However, the court found that respondent "just hasn't demonstrated the ability to address the underlying safety issue, at least during the relevant nine-month period of time that would allow the return of the child home." On March 9, 2019, the trial court entered a written order finding that the State proved count IV of its termination petition.

¶ 23    A best interest hearing was held in May and June 2019. On June 24, 2019, the trial court entered an order finding that was in the best interest of D.R. Jr. to terminate respondent's parental rights.

¶ 24                                    ANALYSIS

¶ 25    Under the Juvenile Court Act of 1987 (Act), the involuntary termination of parental rights involves a two-step process: (1) the State must prove the parent is unfit as defined in section 1D of the Adoption Act (750 ILCS 50/1D (West 2016)); and (2) the court determines whether it is in the best interest of the minor to terminate parental rights (705 ILCS 405/2-29(2) (West 2016)). If the State fails to prove unfitness, a judgment terminating parental rights must be reversed. See *In re Keyon*, 2017 IL App (2d) 160657, ¶ 34.

¶ 26    The Adoption Act lists various grounds under which a parent may be found unfit. 750 ILCS 50/1D (West 2016). Section 1D(m) states that the grounds for unfitness include "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2016).

¶ 27    The State must prove parental unfitness by clear and convincing evidence. *In re D.F.*, 332 Ill. App. 3d 112, 124 (2002). A trial court's finding of unfitness is entitled to deference and will be disturbed only if it is against the manifest weight of the evidence. *Id*. The trial court's finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Id*.

¶ 28    Reasonable progress is an objective standard that focuses on the steps the parent has taken toward the goal of reunification. *Id*. at 125. The standard is measured by the parent's compliance with the court's directives, service plans, or both. *Id*. Reasonable progress requires, at a minimum, that a parent make measurable or demonstrable movement toward the goal of reunification. *Id*.

¶ 29    A parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care can demonstrate failure to make reasonable progress. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. A parent fails to make reasonable progress during a nine-month period when he/she (1) tests positive for drugs; (2) does not complete required

8

drug screens; (3) cancels or misses visits with the child[ren]; (4) fails to attend counseling sessions; and/or (5) does not enroll in or complete substance abuse treatment. See *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 69; *In re K.I.*, 2016 IL App (3d) 160010, ¶¶ 39-40; *In re J.H.*, 2014 IL App (3d) 140185, ¶ 23. Where a parent takes "several steps toward completing the services in her service plan," she makes a "minimum measurable or demonstrable movement toward reunification" and a court's finding that she failed to make reasonable progress is against the manifest weight of the evidence. See *In re Gwynne P.*, 346 Ill. App. 3d 584, 595-96 (2004).

¶ 30         Here, the evidence showed that during the relevant nine-month period, respondent participated in the tasks ordered by the court. She never missed a visit with her son and interacted appropriately with him during visits. She completed a psychological evaluation, a domestic violence class and had already completed a parenting class before the nine-month period began. She attended counseling regularly and never missed a session. During this period, D.R. Jr.'s caseworker, Bradford, described respondent as making "satisfactory progress" and "reasonable efforts" toward having D.R. Jr. returned to her home. Respondent's counselor, Hemmele, testified that respondent made progress in counseling during the relevant time period. The trial court even acknowledged that "certainly during the relevant time period [respondent] was engaged and making efforts."

¶ 31         Nevertheless, the trial court found respondent unfit for failing to make reasonable progress during the relevant nine-month period. According to the court, respondent "just hasn't demonstrated the ability to address the underlying safety issue, at least during the relevant nine-month period of time that would allow the return of the child home." We disagree.

¶ 32         Although respondent was not honest about her continued relationship with D.R. Sr. during the first several months of the relevant nine-month period, by the middle of the relevant nine-

9

month period respondent had cut all ties with D.R. Sr. For the last three months of the relevant time period, respondent made progress in understanding the need to provide a safe environment to D.R. Jr., according to Hemmele. While Hemmele did not believe that respondent was able to ensure D.R. Jr's safety as of August 9, 2018, Hemmele did not expect respondent to complete that task by August 9, 2018, and was still engaged in counseling and working toward that goal.

¶ 33    The "reasonable progress" standard does not require that a parent complete all required tasks or services during the relevant nine-month period. Rather, it requires that a parent take steps toward completing the required tasks and demonstrate movement toward the goal of reunification. See *In re D.F.*, 332 Ill. App. 3d at 125. Here, respondent did that. During the relevant period, respondent maintained suitable housing and employment, was not involved in any domestic violence incidents, did not miss any visits with her son, attended all counseling sessions, and completed all required classes and evaluations.

¶ 34    Because respondent made progress toward the goal of reunification during the relevant nine-month period, the trial court's finding of unfitness is against the manifest weight of the evidence. See *In re Gwynne P.*, 346 Ill. App. 3d at 595-96. We reverse that finding, as well as the trial court's judgment terminating respondent's parental rights. See *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 34.

¶ 35                                    CONCLUSION

¶ 36    The judgment of the circuit court of Peoria County is reversed.

¶ 37    Reversed.

¶ 38    JUSTICE SCHMIDT, dissenting:

¶ 39    Respondent's boyfriend, D.R. Jr.'s father, shot respondent while both she and D.R. Jr. were in a car. D.R. Jr.'s father is in prison for that. This was the most serious of a number of domestic

10

violence incidents between respondent and the minor's father. During the relevant nine-month period, respondent was recorded speaking with the minor's father about working with him to get him out of prison early. She stopped communicating with the father only after confronted with recordings of these conversations and when told that this would impair her right to have her child returned.

¶ 40    One of respondent's counselors testified that she would address issues of domestic violence with respondent when respondent would allow it. When asked about domestic violence, respondent would respond that they argued like "any couple." Respondent would then dismiss the topic. Respondent has repeatedly downplayed the role domestic violence played in the removal of the minor referring to the incidents described above as "heated discussions." See *supra* ¶ 4. In addition, respondent's psychological evaluation described her as purposefully manipulative and deceitful in an effort to control people.

¶ 41    Congruent with respondent's psychological evaluation, the evidence establishes that she would tell counselors what they wanted to hear in an attempt "to manipulate or con" them. She reported in January of 2018 that she had severed contact with the father six weeks earlier. When asked, her counselor agreed that honesty was an important part of the counseling process. Had she known about the relationship with the father, the goals in counseling would have changed. Even though respondent knew the relationship with the father would harm her chances of reunification with the minor, she continued that relationship and even spoke with him about ways to get him out of prison early. The trial court found that when the relationship was finally exposed, "we were further away from the return [of the minor] ***." Respondent's dishonesty while completing the court-ordered services prevented her from making reasonable progress.

11

¶ 42    The majority cites to *Gwynne P.*, 346 Ill. App 3d at 595-96, for the proposition that if an individual takes several steps toward completing the services in a service plan, the individual has made minimum or demonstrable progress toward reunification equating to reasonable progress, and a finding to the contrary is erroneous. *Supra ¶* 29. However, each case concerning parental unfitness is *sui generis*. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). While reasonable progress requires, " 'at a minimum, measurable or demonstrable movement toward the goal of return of the child,' " some progress is not necessarily equivalent to "reasonable progress" considering the right of children not to be in limbo for an unreasonable amount of time. *In re A.S.*, 2014 IL App (3d) 140060, ¶ 17 (quoting *In re M.S.*, 210 Ill. App. 3d 1085, 1093-94 (1991)); *In re A.C.B.*, 153 Ill. App. 3d 704, 708-09 (1987). The majority's attempt to create a proposition of law out of another court's analysis of factual circumstances unique to that case and not present here is unwarranted.

¶ 43    Instead of divining law from one court's analysis of unique facts, I submit that, as stated above, the failure to "correct the conditions that brought the child into care can demonstrate failure to make reasonable progress." *Supra* ¶ 29 (citing *D.T.*, 2017 IL App (3d) 170120, ¶ 17); see also *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001) ("[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent.").

¶ 44    Respondent has shown no qualms with placing the minor in an injurious environment, such being the reason for the adjudication of neglect and removal. After being involved in what was, in essence, a drive-by shooting which imperiled the life of the minor, respondent chose to place her

desires of maintaining a relationship with the perpetrator and seeking his release from prison over the safety of the minor. She then attempted to conceal this relationship until confronted with proof thereof. When asked point blank whether respondent could provide safety for the minor, one of her counselors responded, "No." When asked if respondent was willing to give up the relationship with D.R. Jr.'s father her counselor responded, "I don't think so." Instead of giving deference to the trial court's findings, the majority relies on testimony that the counselor was still working with respondent toward the goal of ensuring the minor's safety. *Supra* ¶ 32; see *D.T.*, 2017 IL App (3d) 170120, ¶ 17 (noting reasonable progress exists when the progress being made is sufficiently demonstrable and of such a quality that the court, in the near future, will be able to order the child returned to parental custody); see also *In re A.M.*, 358 Ill. App. 3d 247, 252 (2005) ("Appellate courts must give great deference to a trial court's finding of unfitness ***.").

¶ 45        Ultimately, we review whether the trial court's judgment was against the manifest weight of the evidence. See *D.F.*, 201 Ill. 2d 476, 498 (2002) (judgment is against the manifest weight of the evidence if it is clearly apparent from the record that the trial court should have reached the opposite conclusion). It is impossible for me to agree with the majority that the trial court erred. Given respondent's inability to put the minor's safety before her own desires, the testimony of her counselors to that effect, respondent's dishonesty while completing the court-ordered services, and respondent's ongoing relationship with the individual who executed a drive-by shooting imperiling the minor, an opposite conclusion from the trial court is not clearly evident. For the better part of the relevant period, respondent exhibited an intent to recreate the injurious environment responsible for the removal of the minor while lying about it to her service providers. I fail to see how this constitutes reasonable progress. The trial court's finding of unfitness was not against the manifest weight of the evidence.

¶ 46   With respect to the termination of parental rights, D.R. has a loving relationship with his foster parents. They wish to give him permanency by adoption. The trial court considered all of the relevant factors and found respondent could not put the minor's welfare and interest ahead of her own. See 705 ILCS 405/1-3(4.05) (West 2016). This was further displayed by respondent's insistence that the minor testify despite the child's counselor stating it was likely not in the minor's best interest. The trial court took issue with respondent's credibility because she refused to take responsibility for what had happened, placing blame elsewhere. The court indicated respondent's denial of what happened during the shooting prevented the minor's safety from being fully addressed and that D.R. Jr. needed someone who would put his needs first.

¶ 47   The evidence shows that the foster parents are D.R. Jr.'s maternal grandparents. They have provided him with a safe, loving environment. They involve him in the community, including attending church and playing organized basketball. This child has been in foster care for over two years. It is time for some permanence in his life. See *In re J.L.*, 236 Ill. 2d 329, 345 (2010). The trial court's finding that it was in the best interest of the minor to terminate respondent's parental rights was not against the manifest weight of the evidence. I would affirm.